IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMINAH HEARD,

                    Plaintiff,

    v.

J AND G SPAS, LLC, D/B/A HAND &
STONE MASSAGE AND FACIAL SPA,

                    Defendant.

CIVIL ACTION
NO. 22-3212

## OPINION

Slomsky, J.                                                    April 8, 2024

### TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 3

II.   BACKGROUND ................................................................................................. 5

      A.    Factual Background ................................................................................ 5

      B.    Procedural Background .......................................................................... 9

III.  STANDARD OF REVIEW .................................................................................. 9

IV.   ANALYSIS .......................................................................................................... 11

      A.    Race Discrimination in Violation of Section 1981, Title VII, and the PHRA ..... 11

            1.   Prima Facie Case of Race Discrimination ....................................... 12

            2.   Legitimate Non-Discriminatory Reason for Adverse
                 Employment Decision ........................................................................ 16

            3.   Pretext for Discrimination ................................................................ 18

      B.    Disability Discrimination under the ADA and PHRA .......................... 21

1.    Prima Facie Case of Disability Discrimination ................................................ 21

2.    Legitimate Non-Discriminatory Reason for Plaintiff's Termination.............. 24

3.    Pretext for Disability Discrimination ............................................................. 24

**C.    Failure to Accommodate Plaintiff's Disability under the ADA**........................... 27

**D.    Disability-Based Retaliation under the ADA and PHRA**.................................... 30

1.    Prima Facie Case of Disability-Based Retaliation ........................................... 30

**V.    CONCLUSION** ........................................................................................................... 32

## I.     INTRODUCTION

A day at the spa is typically a welcome respite for many.  In the instant case, the events that took place on April 13, 2021 at J and G Spas located in Northeast Philadelphia proved an exception to this notion.  On that day, employees on the premises of the spa were involved in a verbal altercation that could be overheard by clients.  It led to Plaintiff Aminah Heard ("Plaintiff" or "Heard") being terminated as an employee and, in turn, her filing suit against her former employer, Defendant J and G Spas, LLC, doing business as Hand and Stone Massage and Facial Spa ("Defendant" or "J and G Spas" or the "Spa").  She alleges that she was terminated because of her race and disability and even that Defendant retaliated against her for asking for a reasonable accommodation for her disability.  (See Doc. No. 24.)  Plaintiff was a massage therapist at the Spa. (See Doc. No. 26-4 at 4.)

Ms. Heard avers that she was subjected to: (1) race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981") ("Count I"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") ("Count II"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA") ("Count IV"); (2) a failure to accommodate her disability in violation of the ADA ("Count III"); (3) disability discrimination in violation of the ADA ("Count III") and the PHRA ("Count IV"), and (4) retaliation in violation of the ADA ("Count III").[1]  (See Doc. No. 24.)

Before the Court is a Motion for Summary Judgment filed by Defendant J and G Spas, LLC.  (Doc. No. 26.)  In the Motion, Defendant argues that summary judgment should be granted

---

[1]  In Plaintiff's Amended Complaint, she also alleges that she was subjected to: (1) a hostile work environment in violation of Section 1981 ("Count I") and Title VII ("Count II") (2) race-based retaliation in violation of Section 1981 ("Count I"), Title VII ("Count II") and the PHRA ("Count IV").  (See Doc. No. 24.)  However, Plaintiff has since stipulated that these claims be dismissed. (See Doc. Nos. 30 at 33, 42, 43.)

on each of Plaintiff's claims in the Amended Complaint because "there are no genuine issues of material fact; and . . . Plaintiff is unable to set forth a prima facie case of race discrimination . . . disability discrimination, or retaliation within the meaning of Section 1981, Title VII, ADA, or the PHRA." (Doc. No. 26-2 at 12.)  Defendant maintains that Plaintiff was terminated following its investigation into the incident on April 13, 2021 because Plaintiff's conduct that day violated Defendant's Personal Behavior, Code of Conduct and Zero Tolerance Employment Policies ("Defendant's Policies").[2]  (See id. at 3.)  Defendant argues that the violation of its Policies

---

[2] Defendant's Policies state in part as follows:

Personal Behavior

a.  "The Company maintains a Zero Tolerance Policy against any kind of improper behavior";

b.  J&G expressly prohibits "physical threats, threatening or abusive language, profanity of any act of aggression or violence towards anyone";

c.  "[T]hreats are deemed to mean any verbal or physical harassment, attempts at intimidation or to instill fear in others, menacing gestures, flashing of concealed weapons, stalking, verbal or physical abuse, or other hostile, aggressive, injurious and destructive actions undertaken for the purposes of domination or intimidation"; and

d.  "Any violations of this policy may lead to disciplinary actions up to and including termination."

. . .

Code of Ethics

a.  "Project a professional image and uphold the highest standards of professionalism" and "Accept responsibility to do no harm to the physical, mental and emotional well-being of clients, associates and self";

b.  "Hand and Stone's strict adherence to its Code of Ethics and Zero Tolerance Policy serves to protect the public and Hand and Stone employees.";

. . .

provided a legitimate business reason for the termination of Plaintiff's employment.  (See id. at 2.)
For reasons stated infra, Defendant's Motion for Summary Judgment will be denied.

## II.     BACKGROUND

### A. Factual Background

In 2019, Plaintiff Aminah Heard, who is a Black and Native American woman, began her
employment with Defendant J and G Spas, LLC.  (See Doc. Nos. 24-1 at 2, 26-4 at 4.)  Plaintiff
was employed as a licensed massage therapist at J and G Spas located in Northeast Philadelphia.
(See Doc. No. 26-4 at 4.)  In this position, Plaintiff was directly supervised by Heather Snock
("Snock"), who was general manager of the Spa where Plaintiff worked.  (See id. at 5.)  Snock
reported directly to Carin Barlow ("Barlow"), who was Regional Director of J and G Spas, LLC.
(See Doc. No. 26-5 at 5.)  Barlow was present at the Northeast Philadelphia location of J and G
Spas three days a week.  (See id. at 6.)  Joseph Erace and Bryan Erace ("Eraces") are the owners
of J and G Spas.  (See id. at 5.)

When Plaintiff was hired in 2019, she informed Barlow that she had a disability: an injury
to her right ankle that occurred during a car accident.  (See Doc. Nos. 26-4 at 16, 30-2 at 2.)  During
her employment with Defendant, she received monthly cortisone shots for her ankle pain.  (See
Doc. No. 26-4 at 18.)  The ankle injury made it difficult for her to stand for long periods of time.
(See id. at 16.)  On March 30, 2021, Plaintiff reached out to Snock and Barlow, her supervisors,
and requested an accommodation for her disability in the form of a rolling cart to lean on for
support during her work and to lessen the strain on her affected ankle.  (See Doc. Nos. 30-2 at 3,

---

e.  J&G has a "Zero Tolerance Policy and considers harassment in all its form to
be a serious disciplinary offense and any violation of this policy will result in
disciplinary action up to and including termination of employment."

(Doc. No. 26-2 at 20-21.)

26-4 at 16.)  The requested cart also would hold the hot stones required for a Himalayan Hot Stone Therapy,[3] a service offered by Plaintiff in her capacity as a massage therapist.  (See Doc. No. 26-4 at 19-20.)  During a Himalayan Hot Stone Therapy treatment, Plaintiff "continuously had to stand up and back down again multiple time[s] to apply the hot stones around a client's body." (Doc. No. 30-2 at 4.)  By holding the stones, the cart would have reduced the movement and strain on Plaintiff's right ankle.  (See id.)  Plaintiff asserts that such a cart would have cost J and G Spas between 150 and 500 dollars.  (See Doc. No. 30 at 23.)  While employed at J and G Spas, Plaintiff never received this requested cart as an accommodation.  (See Doc. No. 26-4 at 16.)

While employed at J and G Spas, Plaintiff worked with two individuals: (1) Brittany Rose Sidner ("Sidner"), who is, like Plaintiff, a person of color, and (2) Meredith O'Brien ("O'Brien"), who is White.  (See Doc. Nos. 26-4 at 34, 26-5 at 16.)  On April 13, 2021, the three women—Plaintiff, Sidner, and O'Brien—were involved in a verbal confrontation while at work at J and G Spas located in Northeast Philadelphia.[4]  (See Doc. No. 26-4 at 41.)  That day, Plaintiff was

---

[3] During a Himalayan Hot Stone Therapy, multiple stones are heated and placed on trigger points in the body to facilitate relaxation.  According to Plaintiff, this service was more difficult to perform due to her disability, and a cart would have helped:

> Because when you are performing the hot stone modality, you have to get up, get down, get up, get down and go around the body. A table would have held stones, and I could have took the stones with me. So that was actually less movement on my ankle.

(Doc. No. 26-4 at 19-20.)

[4] At the time of the incident, Plaintiff and Sidner were romantically involved.  (Doc. No. 26-4 at 13.)  In addition, Plaintiff noted that she filed for a Protection from Abuse Order against Sidner because Sidner "threatened [Plaintiff's] life . . . with a firearm" when Sidner showed Plaintiff a gun in the break room at J and G Spas.  (Doc. No. 26-4 at 14.)  In addition, Plaintiff had been married to a man named Marcus Bowman for fourteen years, and they were married during the time that Plaintiff was employed at J and G Spas.  (See id. at 13.)

standing in the parking lot outside the Spa on a break from work.[5]  (See Def.'s Ex. C; see also Doc. No. 30-2 at 4.)  Sidner pulled into the parking lot in a vehicle, and when Sidner got out of her car, she and Plaintiff exchanged words.  (See id.)  Sidner then walked into the Spa to go to work, and Plaintiff walked into the Spa soon thereafter.  (See Doc. Nos. 30-2 at 4, 26-5 at 14.)  Once inside the building, Plaintiff entered the break room where she placed her handbag in a locker.  (See Doc. No. 30-2 at 4.)  Sidner entered the break room as well, and at that point, Plaintiff asserts that Sidner "threatened to kill [Plaintiff] and brandished her firearm in [Defendant's] break room . . . in a small bag."  (Doc. Nos. 30-2 at 4, 26-4 at 27.)  Sidner then left the break room.  (See Def.'s Ex. D.)  Soon after, Plaintiff also left the break room to "report [] Sidner's threats and possession of a firearm to [] Snock."[6]  (Doc. No. 30-2 at 4.)

At this point, Sidner and Plaintiff became engaged in a verbal dispute[7] which was overheard by their co-worker, O'Brien, a White woman who worked as an aesthetician at the Spa. (See id. at 5.)  O'Brien "began instigating and inciting [ ] Sidner's threats in front of clients near

---

[5] On a Motion for Summary Judgment, the Court must view the facts in the light most favorable to the non-movant.  Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009).  But for the sake of contextualizing Defendant's arguments infra, Defendant alleges that Plaintiff was "lying in wait" in the parking lot, effectively stalking Sidner until she arrived at work for the purposes of confronting Sidner in the parking lot.  (Doc. No. 26-2 at 10.)

[6] For the purposes of the Motion for Summary Judgment, the Court must view the facts in the light most favorable to Plaintiff.  However, for purposes of clarity regarding Defendant's arguments infra, Defendant disagrees with Plaintiff's version of the events on April 13, 2021.  Defendant asserts that Plaintiff "lay in wait" in the parking lot of the Spa and followed Sidner into the Spa where Plaintiff harassed Sidner.  (See Doc. No. 26-2 at 10.)  Defendant also asserts that Plaintiff struck Sidner as Sidner left the break room.  (See Doc. No. 31 at 6, n. 8.)  Defendant's arguments are more properly for a trier of fact to consider at trial.

[7] The dispute between Sidner and Plaintiff concerned cancelled flights to Miami.  (See Doc. No. 26-4 at 29.)  In Plaintiff's words, "Rose and I was supposed to on a vacation and I decided to no longer go. I reached out to her very respectfully via text asking for my funds back. She didn't reply so when I was coming off of my scheduled break and she was coming in to work I decided to talk to her in a very calm none threatening manner in the parking lot."  (Doc. No. 30-3 at 72.)

the front desk . . . [and] arguing with [Plaintiff] loudly in the front of the lobby and refused to stop talking about the firearm situation with other employees after [Plaintiff] had asked her to." (Id.) During Plaintiff's verbal interactions with O'Brien, Plaintiff called O'Brien a "fat b*tch" in the public area of the Spa. (Doc. No. 26-4 at 23.)  In response, O'Brien told Plaintiff to "shut the f*ck up." (See Doc. No. 30-2 at 5.)  Plaintiff asserts that she and Sidner did not raise their voices during the altercation, but O'Brien did.[8] (See Doc. No. 26-4 at 17.)

Following the incident on April 13, 2021, Plaintiff attempted to contact Snock to report the incident and left a voicemail message with Snock. (See Doc. No. 30-2 at 5.)  Snock reached out to O'Brien for a description of what happened on April 13, 2021. (See Doc. No. 26-10 at 2.)  When Plaintiff saw Snock in person, she told Snock about her perspective of what happened during the incident. (See Doc. No. 30-2 at 6.)  Thereafter, Plaintiff was suspended from work, and on April 18, 2021, her employment was terminated. (See Doc. No. 26-4 at 37.)  On the date of her termination, three weeks had elapsed since Plaintiff's request for a cart accommodation.  It was never provided to Plaintiff. (See id. at 21.)

Defendant asserts that it terminated Plaintiff because her conduct on April 13, 2021 violated Defendant's Policies. (See Doc. No. 26-2 at 10.)  Plaintiff alleges that her termination was the result of disability and race discrimination because Defendant did not have any intention of accommodating Plaintiff's disability, and because O'Brien, a White woman, was not terminated despite O'Brien's involvement in the April 13, 2021 incident. (See Doc. No. 24.)

---

[8] O'Brien claims that Plaintiff and Sidner were arguing loudly, and Plaintiff concedes that the verbal dispute could be heard in the Spa. (See Doc. No. 26-4 at 17.)

### B.  Procedural Background

On September 12, 2023, Plaintiff filed the Amended Complaint, which is the operative complaint here.  (Doc. No. 24.)  In the Amended Complaint, Plaintiff brings the following claims: (1) race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981") ("Count I"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") ("Count II"), and the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA") ("Count IV"); (2) failure to accommodate Plaintiff's disability in violation of the ADA ("Count III"); (3) disability discrimination in violation of the ADA ("Count III") and the PHRA ("Count IV"), and (4) retaliation in violation of the ADA ("Count III").  (See Doc. No. 24.)  Plaintiff avers that she was unlawfully terminated in violation of these statutes.

On November 3, 2023, Defendant filed the instant Motion for Summary Judgment.  (Doc. No. 26.)  On December 1, 2023, Plaintiff filed her Response in Opposition.  (Doc. No. 30.)  On December 8, 2023, Defendant filed its Reply.  (Doc. No. 31.)  On December 13, 2023, Plaintiff filed a Motion for Leave to File a Sur-Reply.  (Doc. No. 32.)  On December 14, 2023, Defendant filed a Response in Opposition to Plaintiff's Motion for Leave to File Sur-Reply.  (Doc. No. 33.)  On December 18, 2023, the Court granted Plaintiff's Motion for Leave to File Sur-Reply, and Plaintiff filed her Sur-Reply on December 27, 2023.  (Doc. Nos. 34, 37.)  The Motion for Summary Judgment (Doc. No. 26) is now ripe for an Opinion.

### III.   STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories,

admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  See Anderson, 477 U.S. at 247–49.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party.  See id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  See id. at 250.

## IV.     ANALYSIS

### A.  Race Discrimination in Violation of Section 1981, Title VII, and the PHRA

Plaintiff alleges claims of race discrimination in violation of Section 1981, Title VII, and the PHRA in Counts I, II, and IV of the Amended Complaint.[9]  (See Doc. No. 24.)  Such anti-discrimination statutes prohibit employers from discriminating against employees based on protected characteristics, including race and color.[10]   Under these statutes, when only circumstantial evidence of race discrimination exists, the discrimination claims are analyzed under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The McDonnell Douglas framework first requires that a plaintiff alleging a race discrimination claim establish a prima facie case of discrimination.  411 U.S. 792, 802 (1973).  If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, non-discriminatory reason" for the adverse employment action.  See id.  If the

---

[9] Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  Section 1981 provides: "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  And the Pennsylvania Human Relations Act proscribes: "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer because of the race, color, religious creed, ancestry, age, sex, national origin, or non-job related handicap or disability . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual . . . or to otherwise discriminate against such individual . . . with respect to  compensation, hire, tenure, terms, conditions or privileges of employment or contract . . ." 43 Pa. Stat. Ann. § 955(a).

[10] Claims of race discrimination under Title VII, Section 1981, and the PHRA are governed under the same legal framework.  See Verma v. Univ. of Pa., Civ. A. No. 11-611, 2012 WL 1835727, at *7 (E.D. Pa. May 18, 2012) ("Discrimination claims under the PHRA are subject to the same standards as Title VII for purposes of summary judgment.") (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 409 (3d Cir. 1999)); see also Langley v. Merck & Co., Inc., 186 F. App'x 258, 261 n.2 (3d Cir. 2006) (finding that the elements of employment discrimination under Title VII are "virtually identical" to those under Section 1981).  Therefore, Plaintiff's claims of race discrimination under Section 1981, Title VII, and the PHRA will be analyzed under the same framework.

defendant does advance a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to prove that the reason is pretextual, and the real reason for the adverse action is discrimination.  See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999); see also Boykins v. SEPTA, 722 F. App'x 148, 152 (3d Cir. 2018).

1.  Prima Facie Case of Race Discrimination

To establish a prima facie case of race discrimination, a plaintiff is required to show: (1) she is a member of a protected class; (2) she was qualified for the job that she held; (3) she was terminated; and (4) that her replacement is of a different race than the plaintiff or there is some other basis (such as comparator or statistical evidence) for inferring discriminatory intent. McDonnell Douglas Corp., 411 U.S. at 800-02; see also Jones, 198 F.3d at 410-11.

Here, the first, second, and third prongs are not in dispute.  In this regard, 1) Plaintiff is a Black and Native American Woman; (2) when hired, Plaintiff was qualified to be a licensed massage therapist,[11] and (3) Plaintiff was terminated by Defendant on April 18, 2021.  (See Doc. No. 26-2 at 16.)

Therefore, the only element in dispute is the fourth element: whether the adverse employment action occurred in a manner giving rise to an inference of discrimination.  "A plaintiff may show circumstances giving rise to an inference of discrimination with any kind of relevant evidence, including 'comparator evidence, evidence of similar racial discrimination against other employees, or direct evidence of discrimination from statements or actions by [the plaintiff's] supervisors suggesting racial animus.'"  McFadden v. Whole Foods Mkt. Grp., Inc., Civ. No. 19-

---

[11] When Plaintiff was hired at J and G Spas, she had active massage therapy and cosmetology licenses.  (See Doc. No. 26-4 at 7.)

1103, 2021 WL 736899, at *7 (E.D. Pa. Feb. 25, 2021) (quoting Golod v. Bank of Am. Corp., 403 F. App'x 699, 703 n.2 (3d Cir. 2010)).

Comparator evidence is "evidence that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff." Darby v. Temple Univ., 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (citing Moore v. City of Philadelphia, 461 F.3d 331, 340–41 (3d Cir. 2006)). "While 'similarly-situated' does not necessarily mean identically situated, the plaintiff must nevertheless be similar in "all relevant respects." Mangold v. PECO Energy, Civ. No. 19-5912, 2021 WL 6072818, at *13 (E.D. Pa. Dec. 23, 2021) (citing Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 222-23 (3d Cir. 2009)). To demonstrate discrimination using comparator evidence, courts may "take[] into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." Wilcher v. Postmaster Gen., 441 Fed. App'x 879, 882 (3d Cir. 2011). In the context of workplace disciplinary or personnel actions, relevant factors include a

> showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.

McCullers v. Napolitano, 427 Fed. Appx. 190, 195 (3d Cir. 2011).

In its Motion for Summary Judgment, Defendant argues that O'Brien is not a proper comparator to Plaintiff, and for this reason, Plaintiff does not set forth sufficient facts to satisfy the fourth element. (See Doc. Nos. 26-2 at 16-20, 31 at 11.) Defendant argues that, because O'Brien was an aesthetician, not a massage therapist like Plaintiff, O'Brien is not similarly situated to Plaintiff as a comparator. (See Doc. No. 26-2 at 23-24.) In addition, Defendant contends that O'Brien is not a proper comparator because she did not "stalk[], harass[], threaten[], or call[] a co-worker a 'fat b*tch' or other derogatory names in the public areas of the Spa disrupting the

therapeutic atmosphere of the Spa." (See id. at 18.) At the summary judgment stage, however, this argument is unpersuasive.

Here, Plaintiff has presented evidence from which a jury could conclude that Defendant treated a White employee more favorably than Plaintiff because of her race, thus giving rise to an inference of discrimination. First, Plaintiff has proffered evidence that Plaintiff and O'Brien were similarly situated as comparators. Plaintiff and O'Brien were overseen by the same supervisors at the Northeast Philadelphia location, such as Barlow, the Regional Director of Operations, and Snock, the General Manager. (See Doc. Nos. 26-4 at 5, 39; 26-5 at 5; 26-11.) Further, they were subject to the same standards for conduct, such as Defendant's Policies. (See id.) While Plaintiff and O'Brien provided different services to customers at the Spa in their respective roles, a jury could conclude that Plaintiff and O'Brien were "similarly situated" as fellow service providers at the Spa in all relevant respects.

In addition, Plaintiff has shown that multiple genuine disputes of material fact exist concerning the fourth element, discriminatory intent. For example, Plaintiff has presented evidence from which it can be inferred that the conduct of Plaintiff and comparator O'Brien on April 13, 2021 was sufficiently similar, yet O'Brien, who is White, was treated more favorably after the incident than Plaintiff and Sidner, who are both women of color. Plaintiff alleges that all three women had loud voices in the Spa during the verbal altercation. (See Doc. Nos. 26-4 at 30-32; 30-2 at 5.) In addition, Plaintiff has offered evidence that both she and O'Brien used profanity during the altercation. Plaintiff admits that she called O'Brien a "fat b*tch,"[12] and Plaintiff asserts

---

[12] While Plaintiff admits that she called O'Brien a "fat b*tch," she maintains that the word "b*tch" is not profanity and is "a female dog related to a wolf." (See Doc. No. 26-4 at 32.)

that O'Brien told her to "shut the f*ck up."[13]  (See Doc. Nos. 26-4 at 32-33, 30-2 at 5.)  Plaintiff

also has brought forth other evidence that she and O'Brien were treated differently despite their

sufficiently similar behavior.  For example, Plaintiff asserts that Defendant did not reach out to her

to obtain her account of the events that day, but did reach out to O'Brien.  (See Doc. Nos. 26-5 at

17-18; 30-2 at 6.)  This assertion is supported by the deposition testimony of Barlow, the Manager

of J and G Spas:

> Q:          And when Plaintiff said, "Or what?" to Ms. O'Brien and you said that
>             Ms. O'Brien took that as a threat, did you and/or the owners perceive
>             that as a threat as well?
>
> Barlow:     She stated that she felt that that was a threat. We were not there, so
>             we had to take her explanation of that as -- she said she felt threatened,
>             so we had to listen to that.
>
> Q:          Did you follow up with Plaintiff in regards to whether or not that was
>             a threat?
>
> Barlow:     We didn't follow up with her in regards to that specific aspect of the
>             ordeal, no.
>
> Q:          Did you discuss anything with Plaintiff over the process of deciding
>             whether or not to terminate her?
>
> Barlow:     I believe she had reached out during the suspension process to the
>             owner. We did not necessarily reach back out besides keeping her

---

[13]  Plaintiff's assertion that O'Brien told her to "shut the f*ck up" appears for the first time in her
Declaration contained in Plaintiff's Response in Opposition to Defendant's Motion for
Summary Judgment.  (Doc. No. 30.)  Defendant argues that this Declaration is a "sham
affidavit" that contradicts Plaintiff's previous deposition testimony in an attempt to create a
genuine dispute of material fact after the fact.  (See Doc. No. 31 at 3.)  Viewing the facts in the
light most favorable to Plaintiff, the Declaration of Plaintiff merely supplements and does not
contradict Plaintiff's deposition testimony.  Plaintiff testified in her deposition that she "got
fired for using . . . profanity and doing this zero-tolerance policy in front of staff and clients,
and she did the same thing, and she still had a position, and I didn't."  (Doc. No. 26-4 at 33.)
Plaintiff's Declaration supplements this statement by providing a specific example of the
profanity allegedly used by O'Brien on April 13, 2021.  (See Doc. No. 30-2 at 5.)  Plaintiff and
Defendant disagree as to whether O'Brien also used profanity on April 13, 2021, in violation of
Defendant's company Policies.  This is just one example of the multiple genuine disputes of
material fact in this case.

> aware that we are still investigating and that we would be in touch
> with her shortly.
>
> Q:          So you didn't reach back -- none of you reached back out to Plaintiff
>             during the investigation?
>
> Barlow:     Not that I can recall.

(Doc. No. 26-5 at 17-18.)   After Defendant's investigation concluded, Defendant suspended

Plaintiff as an employee and soon thereafter terminated her for violating the Policies.  (See Doc.

No. 26-4 at 37.)  O'Brien was not terminated by Defendant for her involvement that day.  (See id.

at 33.)

Therefore, there is a genuine dispute of material fact as to the nature of O'Brien's conduct

on April 13, 2021, including whether O'Brien was raising her voice and using profanity in violation

of the company Policies.[14]  Because O'Brien is a White employee who did not suffer adverse action

after the incident, and the parties dispute whether O'Brien and Plaintiff engaged in similar conduct

during the verbal altercation that led to Plaintiff's termination, a genuine dispute of material fact

exists concerning the fourth element, when viewing the facts in the light most favorable to Plaintiff.

2.  Legitimate Non-Discriminatory Reason for Adverse Employment Decision

At the second stage of the McDonnell Douglas framework, an employer defendant can

meet its burden by producing evidence which, taken as true, would allow a reasonable jury to

conclude that there was a legitimate, non-discriminatory reason for the adverse employment

decision.  Fuentes v. Perksie, 32 F.3d 759, 763 (3d Cir. 1994).  Courts have explained that this is a

"relatively light" burden.  Terrell v. Main Line Health, Inc., 320 F. Supp. 3d 644, 657 (E.D. Pa.

2018) (quoting Fuentes, 32 F.3d at 763).  Significantly, at this step, "the employer need not prove

---

[14]  Additionally, the Court does not weigh conflicting deposition testimony at the summary
judgment stage because this would involve a credibility determination, which is solely within
the province of the jury.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

that the proffered reason actually motivated the termination decision . . . " Id. Instead, "throughout

this burden-shifting paradigm[,] the ultimate burden of proving intentional discrimination always

rests with the plaintiff." Fuentes, 32 F.3d at 763.

Here, Defendant has met its burden by offering a legitimate, non-discriminatory reason for

Plaintiff's termination: Plaintiff's violation of Defendant's Policies.  (See Doc. No. 26-2 at 20-21.)

Specifically, Plaintiff "harassed [Sidner] and loudly argued with her in the public hallway of the

Spa and also called the co-worker who tried to diffuse the situation 'fat b[*]tch' numerous times

and told her to 'mind your own business,' 'or what' in the public areas of the Spa disrupting the

therapeutic atmosphere of the Spa . . . ." (Id.)  This reason is supported by the statements of Barlow

at her deposition, who testified as follows:

> Q:          Specifically which part of the code of conduct did she violate?
>
> Barlow:     She harassed another employee, which I was able to see on camera.
>             So then she followed that employee into the Spa, continued to
>             harass; so harassment is against our policy. She was loud, disruptive,
>             argumentative. The clients that were getting massages at the time
>             heard this, and she was approached by another employee that works
>             for us who simply said to both individuals -- because you're not
>             asking about that other one just yet, if at all -- to take whatever
>             argument is happening outside. At that point, Ms. Heard responded
>             to Meredith O'Brien, which is the person that was trying to, you
>             know, de-escalate the situation, to "Mind your business, fat b[*]tch."
>             And when -- I guess she, as in Ms. O'Brien, may have said, you
>             know, something. I don't know what she said after that; again, this
>             is a few years ago. I do recall statements stating that, you know,
>             Aminah had then said, "Or what?" Aggressively, as in, "what are
>             you going to do?" So the combination of the harassment, the
>             disruptive behavior and the complete, you know, disrespect and
>             actual discrimination towards the current -- or towards the employee
>             at that time led to her termination.

(Doc. No. 26-5 at 13-14.)  Thus, this reason suffices as a legitimate, non-discriminatory reason for

Plaintiff's termination.

3. Pretext for Discrimination

A genuine dispute of material fact also exists as to whether Defendant's reason was pretextual. When an employer offers a legitimate non-discriminatory reason for its action in the second step of the <u>McDonnell Douglas</u> framework, any presumption of discrimination disappears. <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 142-43 (2000). As a result, at the third step of the <u>McDonnell Douglas</u> framework, a plaintiff is required to prove by a preponderance of the evidence that the defendant employer's proffered reason was "not its true reason[], but w[as] a pretext for discrimination." <u>Jones</u>, 198 F.3d at 410; <u>see also</u> <u>Harp v. Se. Pennsylvania Transp. Auth.</u>, No. CIV.A. 04-2205, 2006 WL 1517390, at *3 (E.D. Pa. May 31, 2006). A plaintiff may establish pretext to defeat summary judgment through:

> some evidence, direct or circumstantial, from which a fact-finder could reasonably either '(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'

<u>Canada v. Samuel Grossi & Sons, Inc.</u>, 49 F.4th 340, 347 (3d Cir. 2022).

Moreover, "[i]n the context of a summary judgment proceeding, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." <u>Zelesnick v. Temple Univ. Health Sys., Inc.</u>, Civ. No. 19-5820, 2021 WL 201300, at *8 (E.D. Pa. Jan. 20, 2021). "The prima facie case and pretext inquiries often overlap. As [Third Circuit] jurisprudence recognizes, evidence supporting the prima facie case is often helpful in the pretext stage, and nothing about the <u>McDonnell Douglas</u> formula requires us to ration the evidence between one stage or the other." <u>Doe v. C.A.R.S. Prot. Plus, Inc.</u>, 527 F.3d 358, 370 (3d Cir. 2008).

Here, Plaintiff offers several forms of pretext evidence to defeat summary judgment. As described <u>supra</u>, she has set forth evidence from which a jury could find that a White employee was treated more favorably than Plaintiff, a minority employee, following the incident on April

18

13, 2021.  Additionally, she has testified that she did not harass anyone, raise her voice, or use profanity, directly contradicting Defendant's legitimate, non-discriminatory reason for Plaintiff's termination.  For example, Plaintiff testified in her deposition that she did not harass Sidner by waiting for her in the parking lot and following her into the break room.  Plaintiff testified:

> Q:          So didn't it start when you were waiting for her out in the parking lot?
>
> Plaintiff:  I wasn't waiting for anyone in the parking lot. I was on my break.
>
> Q:          Oh, you were on your break?
>
> Plaintiff:  I was on my break.
>
> Q:          You just happened to be outside when she pulled up to come to work?
>
> Plaintiff:  Yes.
>
> Q:          And did you follow her into the Spa?
>
> Plaintiff:  No. My break was over, and I believe it was her start time.
>
> Q:          So then, you followed her in? Or she –
>
> Plaintiff:  I didn't follow anybody in. I went to work.

(Doc. No. 26-4 at 14.)  To the contrary, Plaintiff asserts that she herself was harassed and threatened by Sidner in the break room when Sidner showed a gun to Plaintiff, saying "I stay strapped" to indicate that Sidner was carrying a firearm.  (See id. at 17, 26, 30.)  Plaintiff also testified that she did not raise her voice during the verbal interaction with Sidner and O'Brien in the public area of the Spa.  (See id. at 16-18.)  Plaintiff stated that:

> Plaintiff:  I was not aggressive, no. That's not my recollection.
>
> Q:          Did you raise your voice in the Spa that day arguing with Ms. Sidner?

| Plaintiff: | No, I did not. |
|---|---|
| Q: | You did not. Okay. Did she raise her voice? |
| Plaintiff: | I don't know what a raised voice is. I don't believe she was raising her voice. |

.   .   .

| Q: | Well, you were there. So was Rose yelling at you? |
|---|---|
| Plaintiff: | I don't believe she was yelling, no. |
| Q: | Had she raised her voice? |
| Plaintiff: | She was talking. She wasn't yelling, no. |
| Q: | Did you make any gestures of any type of a threatening manner towards her? |
| Plaintiff: | No. I was very nonaggressive. |
| Q: | You were nonaggressive. Okay. Did you bump into her in the break room? |
| Plaintiff: | No, I did not. |

(Id. at 17.)  Further, Plaintiff testified that she did not use profanity towards O'Brien because the word "b*tch" is not profanity and is "a female dog related to a wolf."  (Id. at 32-33.)

Moreover, Plaintiff's supervisor, Barlow, testified that Plaintiff was a "very good employee."  (Doc. No. 26-5 at 8-9.)  Barlow specifically stated that "[Plaintiff] had received . . . accolades from her clients that she saw, and she did a good job."  (Id. at 9.)  Barlow described Plaintiff as "friendly, kind" and "professional."  (Id. at 10.)  Barlow also noted that Snock, the general manager of the Spa and Plaintiff's direct supervisor, never had complained to her about Plaintiff, "so [she] perceived [Plaintiff] as doing a good job."  (Id. at 11.)  From all this evidence, a jury could find that Defendant's stated reasons for termination were pretextual.

In sum, the evidence discussed above creates a genuine dispute of material fact precluding summary judgment.  Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's racial discrimination claims under Title VII, Section 1981, and the PHRA in Counts I, II, and IV of the Amended Complaint will be denied.

### B.  Disability Discrimination under the ADA and PHRA

In Counts III and IV, Plaintiff alleges that Defendant discriminated against her on the basis of her disability in violation of the ADA and the PHRA.[15]  (See Doc. No. 24.)  The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability."  41 U.S.C. §12112(a).  Claims of disability discrimination under the ADA also are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973).[16]

### 1.  Prima Facie Case of Disability Discrimination

To establish a prima facie case under the ADA, a plaintiff must show that she (1) is disabled, (2) is a "qualified individual,"[17] that is, qualified to perform the essential functions of the position

---

[15] "The PHRA is basically the same as the ADA in relevant respects and Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts."  Rinehimer v. Cemcolift, 292 F.3d 375, 382 (3d Cir. 2002).  Therefore, the Court will address both Plaintiff's claims under the PHRA and the ADA under the same legal framework.

[16] There is no direct evidence of disability discrimination in this case.  Therefore, the burden-shifting analysis set forth in McDonnell Douglas applies.  See Nelson v. Spark Therapeutics, Inc., No. CV 23-843, 2024 WL 113758, at *2 (E.D. Pa. Jan. 10, 2024) (holding that the plaintiff's disability discrimination claims were governed by the burden-shifting framework of McDonnell Douglas because no direct evidence of disability discrimination existed in the case).

[17] Under the second prong, the Third Circuit has held that the "qualified individual" analysis is a two-part inquiry:

> First, a court must determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires.  Second, it must determine whether the individual, with or without reasonable accommodation, can perform the essential functions of the position held or sought.

with or without reasonable accommodation, and (3) suffered an adverse employment action because of the disability.  Tice v. Centre Area Transp. Auth., 247 F.3d 506, 512 (3d Cir. 2001).

Here, the first and second prongs are not in dispute.  Defendant concedes that Plaintiff is disabled due to her ankle injury and that she is qualified based on her status as a licensed massage therapist with a certificate.  (See Doc. No. 26-2 at 27.)  Therefore, the only element at issue is whether Plaintiff suffered an adverse employment decision because of her disability.

Defendant argues that "Plaintiff is unable to point to any fact of record that would support a finding that there is a causal connection between the termination of employment and her disability."  (Id. at 31.)  In particular, Defendant contends that "[t]he undisputed facts of record show that Plaintiff's termination has nothing to do with her disability and has everything to do with her workplace altercation in which she demonstrated aggressive, threatening behavior in front of J&G clients and staff in direct violation of [Defendant's] zero tolerance Code of Ethics and Personal Behavior policies."  (Id. at 34.)  In turn, Plaintiff argues that "Defendant discriminated against [Plaintiff] on the basis of her disability because Defendant replaced [Plaintiff] with a non-disabled individual."  (Doc. No. 30 at 28.)

Courts have held that when a plaintiff alleging disability discrimination presents evidence that she was replaced by a non-disabled person, this evidence supports the third prong of causation in the prima facie case.  See, e.g., Labrice v. City of Philadelphia, No. CV 19-4377, 2024 WL 169657, at *4 (E.D. Pa. Jan. 16, 2024) (holding plaintiff had set forth prima facie case of disability discrimination and satisfied the third element because he was replaced by a non-disabled person); see also Sadare v. Bosch Auto. Serv. Sols. Inc., No. 19-CV-3083 (NEB/ECW), 2022 WL 2992788,

---

Deane v. Pocono Med. Ctr., 142 F.3d 138, 146 (3d Cir. 1998).

at *8 (D. Minn. July 28, 2022) (finding plaintiff had established the third element because he was replaced by a non-disabled person); Rumph v. Randazzo Mech. Heating & Cooling, Inc., No. 17-10496, 2018 WL 5845898, at *4 (E.D. Mich. Nov. 8, 2018) (finding plaintiff had established prima facie case of disability discrimination because she asserted that she was replaced by a non-disabled individual).

Here, there is a genuine dispute of material fact regarding the third element: whether Plaintiff's replacement was non-disabled.   In her declaration, Plaintiff asserts that "[a]fter Defendant terminated my employment because I requested an accommodation, it filled my position with a White nondisabled employee." [18]   (Doc. No. 30-2 at 7.)   However, Barlow's testimony conflicts with Plaintiff's testimony.   Barlow testified that she could not identify Plaintiff's replacement because "[t]here [wa]s no specific person . . . there's always vacancy . . . [s]o even though Ms. Heard and Ms. Sidner were no longer employed with us, prior to that, there were still at least eight openings for massage therapists to come on." (Doc. No. 26-5 at 22.)  As stated above, the Court's role at the summary judgment stage is not to make a credibility determination between Plaintiff and Barlow's deposition testimony.   See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Thus, viewing the facts in the light most favorable to Plaintiff, there is a genuine dispute of material fact as to the third element.  And because there is a genuine dispute of material fact on an element of the prima facie case, there is no necessity to address the final two steps of McDonnell Douglas framework.[19]   In any event, because the

---

[18]  As discussed supra, Plaintiff's declaration supplements her prior deposition testimony and is relevant evidence for the purposes of the Motion for Summary Judgment.

[19]  See, e.g., Wilson v. Graybar Elec. Co. Inc., No. CV 17-3701, 2019 WL 2061607, at *1 (E.D. Pa. May 9, 2019) (denying summary judgment because a genuine dispute of material fact existed as to an element of the plaintiff's prima facie case); see also Ryder v. Westinghouse Elec. Corp., 879 F. Supp. 534, 537 (W.D. Pa. 1995) (denying summary judgment because a genuine dispute of material fact existed as to an element of the prima facie case).

evidence supporting Defendant's legitimate non-discriminatory reason for terminating Plaintiff's employment and a finding that this reason was pretextual is relevant to the analysis of Plaintiff's disability-related retaliation claim, the Court will proceed to the final two steps under McDonnell Douglas.

2.   Legitimate Non-Discriminatory Reason for Plaintiff's Termination

Under the McDonnell Douglas framework, if a plaintiff sets forth a prima facie case of disability discrimination, then the burden shifts to the employer defendant to proffer evidence of a legitimate, non-discriminatory reason for the adverse employment action.   See Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271 (3d Cir. 2010).   A defendant satisfies this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable action."  Id.

Here, Defendant has offered evidence to show that there was a legitimate non-discriminatory reason for Plaintiff's termination: violation of Defendant's Policies on April 13, 2021.  (See Doc. No. 26-2 at 11.)  Therefore, Defendant has satisfied its burden at the second stage of the McDonnell Douglas framework.

3.   Pretext for Disability Discrimination

In addition, a genuine dispute of material fact exists regarding whether Defendant's stated non-discriminatory reason was pretextual.  If an employer proffers evidence to show a legitimate, non-discriminatory reason for its adverse action, then the burden shifts to the plaintiff to prove by a preponderance of the evidence that the defendant's stated reason was pretext for disability discrimination.  Anderson, 621 F.3d at 271.  As stated above, "[t]he prima facie case and pretext inquiries often overlap.  As [Third Circuit] jurisprudence recognizes, evidence supporting the prima facie case is often helpful in the pretext stage, and nothing about the McDonnell Douglas

24

formula requires us to ration the evidence between one stage or the other." <u>C.A.R.S. Prot. Plus, Inc.</u>, 527 F.3d at 370.[20]

Here, Plaintiff provides several forms of pretext evidence.  First, the temporal proximity between Plaintiff's request for an accommodation and termination, coupled with other relevant evidence, is suggestive of pretext.  This would defeat summary judgment.  In this regard, the Third Circuit Court of Appeals has held that temporal proximity is one factor that can be used to establish pretext at the third step of the <u>McDonnell Douglas</u> burden-shifting framework.  <u>See</u> <u>Proudfoot v. Arnold Logistics, LLC</u>, 629 F.App'x 303, 308 (3d Cir. 2015).  For example, in <u>Worthington v. Chester Downs & Marina, LLC</u>, the court held that the temporal proximity of three weeks between the plaintiff's disclosure of disability and termination was evidence that the defendant's legitimate, non-discriminatory reason was pretextual.  No. CV 17-1360, 2018 WL 6737447, at *5 (E.D. Pa. Dec. 21, 2018); <u>see</u> <u>also</u> <u>McCarty v. Marple Twp. Ambulance Corps</u>, 869 F. Supp. 2d 638, 651 (E.D. Pa. 2012) (finding a gap of less than three weeks between the defendant's allusion to the plaintiff's disability-related symptoms and termination was sufficient evidence of pretext to defeat summary judgment); <u>Goodwin v. Univ. of Pennsylvania</u>, No. CV 21-755, 2023 WL 8027306, at *16 (E.D. Pa. Nov. 20, 2023) (finding temporal proximity of sixteen months between defendant's awareness of plaintiff's disability and termination insufficient to defeat summary judgment).

---

[20] As set forth above, a plaintiff may establish pretext to defeat summary judgment by showing "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes</u>, 32 F.3d at 764.  This may include "weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" <u>Burton v. Teleflex</u>, 707 F.3d 417, 427 (3d Cir. 2013) (quoting <u>Fuentes</u>, 32 F.3d at 764).

Here, approximately twenty (20) days passed between Plaintiff's accommodation request and her termination.  (See Doc. Nos. 26-4 at 37; 26-5 at 12.)  As the courts held in Worthington and McCarty, such a short time span between Plaintiff's request and her termination is suggestive that Defendant's legitimate, non-discriminatory reason was in fact pretextual.

Second, as discussed supra, Plaintiff has shown that a non-disabled comparator, O'Brien, her co-worker, was not terminated following the April 13, 2023 incident, and Plaintiff, a disabled employee, was terminated.  The Third Circuit has held that when offering comparator evidence in the context of workplace disciplinary actions, a plaintiff must show that the comparator has "committed offenses of 'comparable seriousness.'" Opsatnik, 335 F. App'x at 223.  "[C]omparable seriousness may be shown by pointing to a violation of the same company rule, or to conduct of similar nature." Wright v. Providence Care Ctr., LLC, 822 F. App'x 85, 93 (3d Cir. 2020).  Just as with Plaintiff's race discrimination claims, O'Brien is also a comparator[21] for the purposes of her disability discrimination claim because she is a similarly situated, non-disabled employee, and, in viewing the facts in the light most favorable to Plaintiff, was similarly involved in the April 13 incident which allegedly violated Defendant's Policies.  As set forth supra, Plaintiff has offered evidence that O'Brien engaged in conduct of comparable seriousness to Plaintiff's conduct on April 13.  In addition, Plaintiff has presented evidence disputing Defendant's legitimate non-discriminatory reason—Plaintiff testified that did not harass Sidner, raise her voice, or use profanity.  Plaintiff also has shown that she performed excellently in her role as a massage therapist and Barlow gave her strong commendations.

---

[21] As set forth above "[a] plaintiff can demonstrate pretext by presenting evidence that similarly situated persons not within the plaintiff's protected class were treated more favorably by the defendant employer." Simpson v. Kay Jewelers, Div. Of Sterling, Inc., 142 F.3d 639, 645 (3d Cir. 2008).

Thus, the evidence marshalled in discovery creates a genuine dispute of material fact that precludes summary judgment on Plaintiff's disability discrimination claim. Accordingly, Defendant's Motion for Summary Judgment on the disability discrimination claim under the ADA and the PHRA in Counts III and IV of the Amended Complaint will be denied.

### C.  Failure to Accommodate Plaintiff's Disability under the ADA

In Count III, Plaintiff alleges that Defendant failed to offer her a reasonable accommodation for her disability. (See Doc. No. 24.) Specifically, Plaintiff alleges that Defendant failed to offer her the accommodation of a rolling table or cart upon which to lean and place her items while performing spa services for clients. (See Doc. Nos. 24 at 7; 30 at 20; 30-2 at 3.) Under the ADA, failure to provide a reasonable accommodation is unlawful discrimination. 42 U.S.C. § 12112(b)(5)(A). When alleging a failure to accommodate claim, a plaintiff must show that: (1) she was disabled, and the employer was aware of the disability; (2) she requested an accommodation or assistance; (3) the employer did not make a good faith effort to assist; and (4) the plaintiff could have reasonably been accommodated. Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 246 (3d Cir. 2006). When an employer is adequately notified of an employee's disability and the employee requests an accommodation for that disability, the onus is on the employer to "engage the employee in the interactive process of finding accommodations." See id. at 246.[22] Engaging in an "interactive process" requires reasonable efforts on the part of an employer to assist the employee and to communicate with the employee in good faith. Megine v. Runyon, 114 F.3d 415, 419-20 (3d Cir. 1997).

---

[22] "Failure to accommodate claims are distinct from claims of disparate treatment and are not governed by the shifting-burden scheme set out in McDonnell Douglas." Bielich v. Johnson & Johnson, Inc., 6 F. Supp. 3d 589, 617 (W.D. Pa. 2014).

Here, it is undisputed that Plaintiff is disabled and Defendant was aware of the disability, satisfying the first prong of the prima facie test.[23]  It is also undisputed that Plaintiff requested the cart accommodation around late March during her employment at J and G Spas.  (See Doc. Nos. 26-4 at 16; 26-5 at 12.)  However, a genuine dispute of material fact exists regarding whether Defendant engaged in a good faith, interactive process with Plaintiff regarding her request for an accommodation for her ankle injury.  Plaintiff asserts that Defendant did not make a good faith effort to accommodate her disability.  (Doc. Nos. 30-2 at 4; 26-4 at 48.)  In her Declaration, Plaintiff asserts that after she requested the accommodation for her ankle injury in a meeting with a supervisor, Defendant "never had any intention" of ordering the table or cart, and had not done so up to the date of her termination.  (Doc. No. 30-2 at 4.)  To the contrary, Defendant asserts that it was in the process of ordering the cart in good faith.  (See Doc. No. 26-5 at 13.)  Barlow testified regarding the process of ordering the cart accommodation for Plaintiff:

> Q:        Do you know -- to the best of your knowledge, do you know who would recall if Plaintiff made a request for a cart to assist her with the hot stone modality?
>
> Barlow:   I would believe she would've asked Heather Snock.
>
>                              . . .
>
> Q:        Ms. Barlow, who determined what kind of stool to even consider ordering or getting for Plaintiff? Who is the decision-maker behind this?
>
> Barlow:   There was no exact decision, but there was conversations between myself -- mostly between Heather and Aminah, but we were asking

---

[23]   In the Motion for Summary Judgment, Defendant "does not dispute that Plaintiff had/has a disability." (Doc. No. 26-2 at 27.)  Defendant also notes that "when she was hired, Plaintiff stated she had been in a car accident and said she had a foot injury." (See id.)  Plaintiff testified that she informed Defendant that she had limited mobility.  (Doc. No. 26-4 at 20.)  Further, Barlow testified that she was aware of Plaintiff's ankle condition.  (See Doc. No. 26-5 at 12.) Viewing the facts in the light most favorable to Plaintiff, the evidence shows that Defendant was aware of Plaintiff's injury and disability.

Aminah what she would need in order to perform her job better. So we didn't really quite get to the ordering process as I was kind of looking at different stools that would allow her to kind of navigate around the table a little more easily than the current one. So there was no stool ordered, and we were simply looking into what would be best for her.

Q:         And when you say "we" after having conversations with Ms. Heard, that would be you and Ms. Heather Snook [sic]?

Barlow:    Snock. Yes.

Q:         Okay. And you stated that you were looking into different stools?

Barlow:    Correct.

Q:         What does that mean? Does that mean you were browsing the internet?

Barlow:    Correct.

Q:         Do you recall what -- where you were browsing for these stools?

Barlow:    Google.

Q:         Did you ever land on -- and did you ever land on any particular websites, or you just -- you stayed on Google?

Barlow:    Stayed on Google. We were just looking for chairs. There was no massage chair, so we were looking for stools in a massage treatment room, and much of what we were receiving is similar to what we already had in the Spa. So if that was not sufficient and accommodating her, we were looking at just different stools altogether.

Q:         And you stated that, no -- again, no stool was ever ordered; is that right?

Barlow:    Correct.

(Id. at 12-13.)

Based upon the deposition testimony of Barlow and Plaintiff, a genuine dispute of material fact exists regarding Defendant's good faith engagement in the interactive process to accommodate

Plaintiff's disability. Again, credibility determinations are not made at the summary judgment stage. That task is reserved for the jury at trial. And the question of whether Defendant was searching Google for three weeks in good faith or for the purposes of delaying to provide Plaintiff with the cart accommodation warrants a credibility determination by the jury. Because the Court will not decide who to believe, Barlow or Plaintiff, on whether Defendant engaged in the interactive process in good faith, summary judgment on the Plaintiff's failure to accommodate claim will not be granted.

### D. Disability-Based Retaliation under the ADA and PHRA

Finally, in Count III, Plaintiff alleges that she was retaliated against for requesting an accommodation in violation of the ADA and the PHRA. (See Doc. No. 24.) As above, the McDonnell Douglas burden-shifting framework also applies to retaliation claims under the ADA.[24] See Campo v. Mid-Atl. Packaging Specialties, LLC, 564 F. Supp. 3d 362, 392 (E.D. Pa. 2021).

#### 1. Prima Facie Case of Disability-Based Retaliation

To set forth a prima facie case of disability-based retaliation under the ADA, Plaintiff must show that (1) she engaged in a protected activity; (2) she was subject to an adverse employment action following or contemporaneous with the protected activity; and (3) a causal connection exists between the protected activity and the adverse action. See Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000). The Third Circuit has held that requesting an accommodation for a disability is protected activity under the ADA. See Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d Cir. 2003); Sulima v. Tobyhana Army Depot, 602 F.3d 177, 188 (3d Cir. 2010).

---

[24] As noted above, "[t]he PHRA is basically the same as the ADA in relevant respects and Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts." Rinehimer v. Cemcolift, 292 F.3d 375, 382 (3d Cir. 2002). Therefore, the Court will use the same analysis for both Plaintiff's retaliation claims under the PHRA and the ADA.

Here, the undisputed evidence shows that (1) Plaintiff engaged in protected activity by requesting an accommodation of a table or cart for her to lean on when performing certain services; and (2) she was terminated on April 18, 2021 following this request.  However, a genuine dispute of material fact exists on the third element regarding a causal connection.

A reasonable factfinder could find that Plaintiff's request for an accommodation is causally connected to Defendant's decision to terminate Plaintiff.  Plaintiff requested the new cart accommodation in late March.  (See Doc. No. 26-5 at 12.)  Plaintiff's employment was terminated on April 18, 2021.  (See Doc. No. 26-5 at 37.)  While Barlow, Plaintiff's supervisor, replied that she would "of course," provide the table, her deposition testimony shows that there was no plan set in place after three weeks to accommodate Plaintiff, just a vague reference to "googling."  (See Doc. No. 26-2 at 30; 26-5 at 13.)  Viewing the facts in the light most favorable to Plaintiff, a reasonable factfinder could find that the close temporal proximity between Plaintiff's accommodation request and her termination, along with Barlow's testimony, raises an inference that Plaintiff was terminated in retaliation for her accommodation request.  Additionally in her Declaration, Plaintiff states that "[Defendant] never ordered a table for me, followed up with me about ordering a table or cart and clearly had no intention of doing so."  (Doc. No. 30-2 at 4.) Thus, it is proper for a jury to determine whether Plaintiff has established causation for the purposes of her retaliation claim under the ADA.  Although Defendant has provided, as with the other claims, a legitimate non-discriminatory reason for Plaintiff's termination (that Plaintiff violated Defendant's Policies), Plaintiff has raised a genuine dispute of material fact: whether Defendant's delay in accommodating her was based on an intent to ultimately terminate her in retaliation for requesting the cart.

The evidence relating to Defendant's non-discriminatory reason for termination and evidence in support of pretext is duplicative of the analysis on Plaintiff's other claims.  Thus,  an analysis of the remaining steps under <u>McDonnell Douglas</u> with regard to Plaintiff's disability-related retaliation claim would be repetitive of the prior analysis of Plaintiff's other discrimination claims.  For this reason, Plaintiff has raised a genuine issue of material fact as to whether Defendant's reason for terminating her was pretextual and, consequently, summary judgment on the ADA retaliation claim will be denied.

**V.    CONCLUSION**

For these reasons, Defendant's Motion for Summary Judgment (Doc. No. 26) will be denied.  An appropriate Order follows.